# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SAYE N. KILIKPO, | No. 4:20-CV-00902 |
| Petitioner, | (Judge Brann) |
| v. | |
| CLAIR DOLL, *et al.*, | |
| Respondents. | |

## MEMORANDUM OPINION

### JUNE 29, 2020

**I.    BACKGROUND**

Saye N. Kilikpo filed this emergency 28 U.S.C. § 2241 petition alleging that his continued civil detention violates his due process rights under the Fifth Amendment to the United States Constitution.[1] Specifically, Kilikpo alleges that his detainment constitutes prohibited punishment and amounts to deliberate indifference to his serious medical needs.[2]

Kilikpo is a citizen of Liberia who was admitted to the United States in 1988 as a non-immigrant consulate office employee for a period not to exceed the duration of his status as such an employee.[3] In 1990, Kilikpo filed an application for asylum, which was later closed after the Government erroneously failed to mail Kilikpo a

---

[1]  Doc. 1.
[2]  *Id.*
[3]  *Id.* at 5, 7; Doc. 4-1 at 5.

notice to appear.[4] Kilikpo currently has an application for asylum pending before the immigration courts.[5]

In January 2020, Kilikpo was detained by the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE") and placed into removal proceedings.[6] Kilikpo is currently confined at York County Prison ("York County") pending his removal from the country.[7] He suffers from high blood pressure, which he alleges places him at an increased risk of death or serious injury if exposed to Coronavirus Infectious Disease 2019 ("COVID-19").[8]

Upon receipt of Kilikpo's emergency § 2241 petition, the Court directed the Government to file a response within one week.[9] The Government submitted a timely response and argues that Kilikpo's petition should be denied because his conditions of confinement do not violate the Constitution.[10] The matter is now ripe for disposition and, for the reasons discussed below, the petition will be denied.

---

[4] Doc. 4-1 at 5.
[5] Doc. 1 at 7.
[6] Doc. 4-1 at 5.
[7] Doc. 1 at 6.
[8] *Id.* at 6, 15, 21-22.
[9] Doc. 2.
[10] Doc. 4.

### A. COVID-19

In recent months, COVID-19 has swept across the world and been declared a global health pandemic by the World Health Organization.[11] "Because COVID-19 is caused by a novel form of the coronavirus, humans have no immunity to the virus and, currently, there is no cure, vaccine, or known anti-viral treatment for COVID-19."[12] "The virus is highly contagious, and is spread through respiratory particles of moisture and mucous that are transmitted through the air or which fall on surfaces that are later touched by an individual."[13] "The primary method used to combat the spread of COVID-19, social[] distancing, seeks to maintain enough distance between individuals to break the chain of transmission—generally at least six feet."[14]

Most individuals infected with COVID-19 develop only mild or moderate respiratory symptoms and recover with no medical intervention, but in a minority of cases, individuals experience serious illness or death.[15] Some populations—most notably the elderly and those with certain preexisting medical conditions—are more susceptible to developing serious illness than others.[16] Underlying medical

---

[11] *CDC's Response to COVID-10*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cdcresponse/index.html (last visited June 25, 2020).

[12] *Engelund v. Doll*, No. 4:20-CV-00604, 2020 WL 1974389, at *1 (M.D. Pa. Apr. 24, 2020).

[13] *Id.*

[14] *Id.*

[15] *Q&A on Coronavirus (COVID-19): What Are the Symptoms of Coronavirus*, World Health Organization, https://www.who.int/news-room/q-a-detail/q-a-coronaviruses (last visited June 25, 2020).

[16] *Coronavirus Disease 2019 (COVID-19): Groups at Higher Risk for Severe Illness*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited June 25, 2020).

conditions that increase an individual's susceptibility to COVID-19 include: chronic lung or kidney disease, hemoglobin disorders, moderate to severe asthma, serious heart conditions, compromised immune systems, severe obesity, diabetes, or liver disease.[17] Significantly, while pulmonary hypertension is listed as a serious heart condition that qualifies as such an underlying medical condition, that disorder is distinct from ordinary high blood pressure.[18] "Of those infected with COVID-19, approximately 80% develop mild or moderate symptoms and 20% require hospitalization—with approximately 2-3% of afflicted individuals dying from the virus."[19]

The spread of COVID-19 has thus far been rapid and inexorable. As of June 25, 2020, there are 9,457,902 reported cases globally, with 483,247 reported deaths.[20] As of June 24, 2020, the number of confirmed cases in the United States stands at 2,336,615, while there were more than 121,117 deaths in this country.[21] By that same date, in Pennsylvania there were 80,810 confirmed cases of COVID-19,

---

[17] *Id*.
[18] *Coronavirus Disease 2019 (COVID-19): Groups at Higher Risk for Severe Illness, Serious Heart Conditions*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#serious-heart-conditions (last visited June 25, 2020).
[19] *Engelund*, 2020 WL 1974389, at *1.
[20] Johns Hopkins University, Coronavirus Resource Center, https://coronavirus.jhu.edu/map.html (last visited June 25, 2020).
[21] *Coronavirus Disease 2019 (COVID-19): Cases of Coronavirus Disease (COVID-19) in the U.S.*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited June 25, 2020).

with 6,518 COVID-19 related fatalities.[22] Also as of June 24, 2020, nationwide 899 current ICE detainees have tested positive for COVID-19, while two have died.[23] In York County, one ICE detainee tested positive for COVID-19 on April 3, 2020,[24] but that detainee has since been released and there have been no other reported cases in the facility since that date.[25]

### B. Conditions of Confinement

At York County, detainees are confined in dormitory-style rooms that, in ordinary circumstances, contain fifty detainees, with beds spaced approximately two feet apart.[26] York County has the capacity to house 2,245 individual and "has historically often operated near capacity."[27] As of the morning of June 5, 2020, York County housed 1,159 individuals.[28]

York County provides detainees with "daily access to sick calls in a clinical setting" as well as "onsite medical staff 24 hours a day, 7 days a week with the ability to admit patients to the local hospital for medical, specialty, or mental health care."[29] Since the start of the current pandemic, York County has taken several measures to

---

[22] *COVID-1 Data for Pennsylvania*, Pennsylvania Department of Health, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx (last visited June 25, 2020).

[23] Immigration and Customs Enforcement, ICE Guidance on COVID-19: ICE Detainee Statistics, https://www.ice.gov/coronavirus#citations (last visited June 25, 2020).

[24] Doc. 4-1 at 7.

[25] *Id.*; *see also* Immigration and Customs Enforcement, ICE Guidance on COVID-19: *ICE Detainee Statistics*, https://www.ice.gov/coronavirus#citations (last visited June 25, 2020).

[26] *Engelund*, 2020 WL 1974389, at *4.

[27] Doc. 4-1 at 2.

[28] *Id.*

[29] *Id.* at 3.

mitigate the threat of COVID-19 within the facility. During intake medical screenings, detainees are assessed for fever and respiratory illness and are asked whether, in the past fourteen days, they have had close contact with a person infected with COVID-19 or have traveled through areas with sustained community transmission.[30]

Detainees with symptoms of COVID-19 are placed in isolation and tested for the virus.[31] If any individuals test positive, they remain isolated and are treated; if necessary, they are transferred to a local hospital for further treatment.[32] Asymptomatic individuals are placed in "cohorts"[33] with restricted movement for a period of fourteen days following their last potential exposure to COVID-19, which is thought to be the outer end of the virus' incubation period.[34] The detainees are monitored daily for fever and symptoms of respiratory illness.[35] Importantly, York County "is [also] now routinely testing all detainees transferred to [York County]

---

[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] According to the Government, "[c]ohorting is an infection prevention strategy which involves housing detainees together who were exposed to a person with an infectious organism but are asymptomatic. This practice lasts for the duration of the incubation period of 14 days, because individuals with these and other communicable diseases can be contagious before they develop symptoms and can serve as undetected source patients. Those that show onset of fever and/or respiratory illness are referred to a medical provider for evaluation. Cohorting is discontinued when the 14-day incubation period completes with no new cases." *Id.*
[34] *Id.*
[35] *Id.*

from another facility for COVID-19 if they do not possess confirmation of a negative test from the previous facility."[36]

York County also provides inmates with soap, water, and "hard surface disinfectant."[37] Each detainee is issued a bar of soap for use, which is "immediately" replaced upon exhaustion.[38] Alcohol-based hand sanitizer is available for staff but, for security purposes, is not provided to detainees.[39] "High traffic and contact areas are cleaned repeatedly throughout the day. The facility administration is encouraging both staff and the general population to use these tools often and liberally."[40] Medical personnel also "conduct roving temperature checks throughout the facility to monitor for COVID-19 symptoms."[41]

Detainees have been provided protective masks to help prevent the spread of COVID-19:

> All detainees and inmates were issued surgical masks to wear on or about April 7, 2020. All detainees and inmates were issued a second surgical mask on or about April 14, 2020. Detainees and inmates must wear their issued mask anytime they are out of their cell. In all "dormitory" housing areas, detainees and inmates must wear masks when not sleeping. If they can wear the mask while sleeping it is preferred, but not mandatory. The detainee or inmate may remove the mask to eat, take drinks, and to shower. All inmates and detainees must wear their mask during recreation. The masks will be laundered once a

---

[36] *Id.* at 7.
[37] *Id.* at 4.
[38] *Id.*
[39] *Id.* The Centers for Disease Control and Prevention ("CDC") recommends the use of alcohol-based hand sanitizer only "[i]f soap and water are not readily available." How to Protect Yourself and Others, *available at* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited June 25, 2020).
[40] Doc. 4-1 at 4.
[41] *Id.* at 8.

    week. One mask will be placed in their laundry bag and sent out in accordance with the housing unit's normal laundry schedule. All detainees and inmates are not permitted to wash their own masks. Detainees and inmates must follow all directions concerning the donning and doffing of masks. These directions were provided to each inmate when they received their mask on or about April 8, 2020. Detainees on isolation status are required to wear a N-95 mask when they leave a cohorted housing unit. Additionally, any detainees being transported to a hospital or outside medical appointment or as directed by . . . medical staff, are required to wear a surgical mask. Detainees and inmates were instructed to wash their hands thoroughly before touching the mask.[42]

Detainees who refuse to wear a mask are removed from their housing unit and placed in an isolated cell.[43]

    York County has also begun taking steps to protect the prison from outside exposure. York County now screens all staff and vendors when they enter the facility, including the use of body temperature checks,[44] and requires that all staff or personnel entering the facility wear an N-95 mask.[45] The facility also limits contact between detainees and their visitors by permitting only telephonic or video contact or non-contact legal visits in the facility's visitation room.[46]

---

[42] *Id.* at 7-8.
[43] *Id.* at 8.
[44] *Id.* at 4.
[45] *Id.* at 7.
[46] *Id.* at 4.

## II.   DISCUSSION

The Government argues that no constitutional violation has occurred here for two reasons.[47] First, the Government asserts that Kilikpo's conditions of confinement do not amount to the unconstitutional punishment of a civil detainee, in violation of the Fifth Amendment.[48] Second, the Government argues that York County has not been deliberately indifferent to Kilikpo's medical needs.[49]

### A.   Conditions of Confinement

With respect to Kilikpo's claim that conditions at York County violate the Constitution, he must demonstrate that his conditions of confinement "amount to punishment of the detainee."[50] "To determine whether challenged conditions of confinement amount to punishment, this Court determines whether a condition of confinement is reasonably related to a legitimate governmental objective; if it is not, [this Court] may infer that the purpose of the governmental action is

---

[47] Doc. 4 at 15-28.
[48] *Id.* at 15-20.
[49] *Id.* at 20-26. Because Kilikpo is a civil detainee, his claims proceeds under the Fifth Amendment, rather than the Eighth Amendment, although the elements of a claim under the Fifth Amendment are identical to a claim under the Eighth Amendment. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1877 (2017) (noting that while plaintiff's "'deliberate indifference' claim . . . [proceeded] under the Fifth Amendment's Due Process Clause, not the Eighth Amendment's Cruel and Unusual Punishment Clause . . . that is because the latter applies to convicted criminals while the former applies to pretrial and immigration detainees" (Breyer, J., dissenting)); *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244, 103 S. Ct. 2979, 2983, 77 L. Ed. 2d 605 (1983) (stating that "the due process rights of a person [under the Fifth Amendment] are at least as great as the Eighth Amendment protections available to a convicted prisoner"). *See also Powers-Bunce v. D.C.*, 541 F. Supp. 2d 57, 66 (D.D.C.) ("The Court looks to the two-part analysis laid out in *Farmer v. Brennan,* 511 U.S. 825 (1994), to decide whether a Fifth Amendment violation was perpetrated by the individual Defendants), *reconsidered in part on other grounds*, 576 F. Supp. 2d 67 (D.D.C. 2008).
[50] *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

[unconstitutional] punishment."[51] Stated differently, the Court must consider "whether the conditions and restrictions of the Jail were rationally connected to these valid objectives and whether the conditions and restrictions were excessive in relation to these objectives."[52]

In assessing whether a governmental interest is legitimate, the Supreme Court has not "detail[ed] the precise extent of the legitimate governmental interests that may justify conditions or restrictions of pretrial detention."[53] However, the Supreme Court has recognized that ensuring detainees' presence at hearings, along with "the effective management of the detention facility once the individual is confined" constitute legitimate governmental interests.[54] The Third Circuit has also held, in an unpublished opinion, that the Government has a "legitimate . . . interest[] in reducing the flight risk posed by prisoners facing removal."[55]

Viewed under this standard, the Court concludes that Kilikpo's conditions of confinement do not amount to unconstitutional punishment. First, it is beyond cavil that the Government has a legitimate governmental interest in preventing Kilikpo from absconding and avoiding removal. Second, Kilikpo's continued confinement is reasonably related to that legitimate governmental interest, as it guarantees that Kilikpo will attend his deportation proceedings.

---

[51] *E. D. v. Sharkey*, 928 F.3d 299, 307 (3d Cir. 2019) (internal quotation marks omitted).
[52] *Union Cty. Jail Inmates v. Di Buono*, 713 F.2d 984, 993 (3d Cir. 1983).
[53] *Bell*, 441 U.S. at 540.
[54] *Id.*
[55] *Builes v. Warden Moshannon Valley Corr. Ctr.*, 712 F. App'x 132, 134 (3d Cir. 2017).

Although there are other methods that may help ensure that Kilikpo complies with deportation proceedings, detainment is the only method that guarantees the fulfillment of the Government's goal. Moreover, the relevant question is not whether there are other, less restrictive methods at the Government's disposal, or even whether the Government's chosen course of action is the wisest or best way to proceed.[56] The only limitation on the Government's ability to act is that the chosen course of action be reasonably related to its legitimate goal. Here, that standard is clearly satisfied.

The current conditions at York County do not undermine this conclusion. The Court recognizes that "[p]risons present unique concerns regarding the spread of this virus; by their very nature, prisons are confined spaces unsuited for 'social distancing.'"[57] Nevertheless, CDC guidelines specifically contemplate that individuals will be confined within prisons during the duration of this pandemic.[58] More importantly, conditions no longer resemble the "unsanitary, tightly-packed environments" that led a different court in this District to order the release of ICE detainees.[59] To the contrary, the record reflects that York County has taken proactive

---

[56] *Cf. Bell v. Wolfish*, 441 U.S. 520, 539 (1979) ("Courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility").

[57] *Verma*, 2020 WL 1814149, at *4.

[58] *See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited June 25, 2020).

[59] *Thakker*, 2020 WL 1671563, at *8.

measures to prevent or limit the spread of COVID-19 and to ensure the health of its detainees.

First, although York County does not permit the type of social distancing that individuals may undertake in their homes,[60] the facility has removed many detainees and is now operating far below its historical capacity: as of June 5, York County was operating at under fifty-two percent capacity.[61] Accordingly, there may now only be 26 individuals in a room, rather than 50 as before.

Second, York County is taking significant measures to sanitize the detainees' environment, as well as prevent the introduction or spread of COVID-19 within the facility. York County has begun "routinely testing all detainees transferred to the [facility] from another facility for COVID-19 if they do not possess confirmation of a negative test from the previous facility."[62] York County has also incorporated into its intake medical screenings test questions designed to elicit whether an incoming detainee has potentially been exposed to COVID-19.[63] Detainees with symptoms of COVID-19 are placed in isolation, tested, and treated; asymptomatic individuals are cohorted and restricted in their movements, and monitored daily for symptoms.[64]

---

[60] *See* Doc. 1 at 13, 20.
[61] Doc. 4-1 at 2.
[62] *Id.* at 7.
[63] *Id.* at 3.
[64] *Id.*

York County provides inmates with soap, water, and "hard surface disinfectant" that is replaced when exhausted.[65] Alcohol-based hand sanitizer is provided to staff, and "[h]igh traffic and contact areas are cleaned repeatedly throughout the day."[66] York County has provided all inmates with surgical masks that they are to wear at nearly all times, while staff and inmates in isolation must wear N-95 masks.[67] The facility has also taken steps to prevent COVID-19 from entering the facility from outside: all staff and vendors are screened when they enter the facilities, including with body temperature checks, and meetings with visitors are non-contact only.[68]

Third, York County implemented medical procedures to ensure that sick detainees are promptly tested for COVID-19 and, if necessary, quarantined and treated.[69] Moreover, medical staff "conduct roving temperature checks throughout the facility to monitor for COVID-19 symptoms."[70]

The sum of these measures ensures that Kilikpo's conditions of confinement are no longer unconstitutionally overcrowded or unsanitary. Indeed, the measures have been incredibly effective at curbing the introduction or spread of COVID-19 in York County; since the measures have been put into place, not a single ICE detainee

---

[65] *Id.* at 4.
[66] *Id.*
[67] *Id.* at 4, 7.
[68] *Id.* at 7.
[69] *Id.* at 3.
[70] *Id.* at 8.

at York County has tested positive for COVID-19, and there have been no cases within the facility for nearly three months.[71]

Even judges who previously determined that the conditions of confinement at York County violated the Fifth Amendment have reconsidered in light of these new procedures, emphasizing that "[c]onsidering the drastic changes put into effect at [York County], and the evidence that they are able to effectively control transmission from COVID-positive inmates, . . . the improved conditions therein do not negate the Government's legitimate interest in detention."[72] In sum, the record reflects that detainees at York County now receive adequate protection from COVID-19, and Kilikpo's conditions of confinement therefore do not amount to punishment in violation of the Constitution.

### B.  Deliberate Indifference

Turning to Kilikpo's claim for deliberate indifference, the Constitution "prohibits any punishment which violates civilized standards and concepts of humanity and decency."[73] When applied to allegations of inadequate medical care, prison officials violate the Fifth Amendment "when they exhibit deliberate indifference to serious medical needs of prisoners."[74] That "standard requires

---

[71] *Id.* at 7; *see* Immigration and Customs Enforcement, ICE Guidance on COVID-19: *ICE Detainee Statistics*, https://www.ice.gov/coronavirus#citations (last visited June 25, 2020).

[72] *Thakker v. Doll*, __ F.Supp.3d __, __, No. 1:20-CV-480, 2020 WL 2025384, at *5 (M.D. Pa. Apr. 27, 2020).

[73] *Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020) (internal quotation marks omitted).

[74] *Woloszyn v. Cty. of Lawrence*, 396 F.3d 314, 320 (3d Cir. 2005) (internal quotation marks omitted).

deliberate indifference on the part of prison officials and [that] the prisoner's medical needs be serious."[75] As to the serious medical needs requirement, "[t]he detainee's condition must be such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death."[76]

Deliberate indifference is demonstrated where "the custodial officials 'knew or should have known' of [a] strong likelihood" of unnecessary suffering, injury, or death.[77] Thus, "there can be no reckless or deliberate indifference to that risk unless there is something more culpable on the part of the officials than a negligent failure to recognize [such] high risk"[78] "Therefore, the 'should have known' element . . . connotes something more than a negligent failure to appreciate the risk . . . presented [to] a particular detainee, though something less than subjective appreciation of that risk."[79] "[T]he risk of . . . injury must not only be great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges."[80]

In light of the measures that York County has taken to protect its detainees, the Court concludes that Kilikpo has failed to establish that prison officials have exhibited deliberate indifference to his medical needs. Although COVID-19 presents

---

[75] *Id.* (brackets, ellipsis, and internal quotation marks omitted).
[76] *Id.*
[77] *Id.*
[78] *Id.*
[79] *Id.*
[80] *Id.*

a serious medical issue, as detailed above, the facility has taken significant steps to curb the introduction or spread of COVID-19 and to contain and treat those who may become infected with the virus. It bears repeating that, since York County implemented those changes, not a single new case of COVID-19 has been reported in that facility.[81]

Those measures—and their efficacy—demonstrate that York County recognizes the significant threat that COVID-19 poses to its detainees and has taken responsible steps to protect them. Under such circumstances, it cannot be said that Respondents have been deliberately indifferent to Kilikpo's health, safety, or medical needs, and there certainly is no "evidence [of] an absence of any concern for the welfare of [their] charges."[82] To the contrary, York County has "quickly and effectively implemented the guidelines published by the CDC such that [it has] stymied any potential outbreak within [its] walls . . . and the single reported case at [York County] appears to have been effectively contained."[83] As another judge in this District aptly stated in a recent opinion: "There is no perfect solution to preventing the spread of COVID-19 in detention facilities, but York County Prison officials have taken reasonable steps to limit the spread throughout its facility.

---

[81] Doc. 4-1 at 7; *see* Immigration and Customs Enforcement, ICE Guidance on COVID-19: *ICE Detainee Statistics*, https://www.ice.gov/coronavirus#citations (last visited June 25, 2020).
[82] *Woloszyn*, 396 F.3d at 320.
[83] *Thakker*, 2020 WL 2025384, at *8.

[Petitioner therefore] has not established a conscious disregard for the risk posed by COVID-19."[84]

Of perhaps equal significance to the steps that York County has taken is the fact that there is no evidence that Kilikpo's medical "condition [is] such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death."[85] Although Kilikpo apparently suffers from high blood pressure,[86] there is no evidence in the record that this condition increases the risks posed to Kilikpo by COVID-19, and the CDC does not list high blood pressure as a disease that places one at an increased risk from the virus.[87] In the absence of any underlying condition that would render Kilikpo especially susceptible to the virus, it is difficult to conclude that he is at serious medical risk, let alone that Respondents have been deliberately indifferent to that risk. Accordingly, Kilikpo's § 2241 petition must be denied.

---

[84] *Verma*, 2020 WL 1814149, at *6.
[85] *Woloszyn*, 396 F.3d at 320.
[86] Doc. 1 at 6.
[87] *Coronavirus Disease 2019 (COVID-19): Groups at Higher Risk for Severe Illness*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited June 25, 2020); *Coronavirus Disease 2019 (COVID-19): Coronavirus Disease 2019 (COVID-19): Groups at Higher Risk for Severe Illness, Serious Heart Conditions*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#serious-heart-conditions (last visited June 25, 2020).

### III.   CONCLUSION

For the foregoing reasons, Kilikpo's 28 U.S.C. § 2241 petition will be denied.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge
